# IN THE SUPREME COURT, STATE OF WYOMING

## 2023 WY 40

**APRIL TERM, A.D. 2023**

**April 28, 2023**

IN THE INTEREST OF: BG, minor child,

NG,

Appellant
(Respondent),

v.

THE STATE OF WYOMING,

Appellee
(Petitioner).

IN THE INTEREST OF: BG, minor child,

AG,

Appellant
(Respondent),

v.

THE STATE OF WYOMING,

Appellee
(Petitioner).

S-22-0180, S-22-0181

*Appeal from the District Court of Sheridan County*
*The Honorable William J. Edelman, Judge*

*Representing NG:*

M. Jalie Meinecke, Meineke & Sitz, LLC, Cody, Wyoming. Argument by Ms. Meinecke.

*Representing AG:*

Sarah G.R. Phillips, Bighorn Mountain Legal Services, LLC, Sheridan, Wyoming. Argument by Ms. Phillips.

*Representing the State of Wyoming:*

Bridget Hill, Wyoming Attorney General; Christina F. McCabe, Senior Assistant Attorney General; Shawnna M. Lamb, Senior Assistant Attorney General. Argument by Ms. Lamb.

*Office of the Guardian ad Litem:*

Joseph R. Belcher, Director, Wyoming Office of Guardian ad Litem; Kim Skoutary Johnson, Chief Trial and Appellate Counsel.

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, and GRAY, JJ., and PEASLEY, D.J.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**PEASLEY, District Judge**.

[¶1]   On February 8, 2021, the State of Wyoming filed a petition against NG (Mother) alleging neglect of the minor child, BG.  Following a shelter care hearing,[1] the juvenile court removed BG from Mother's home and placed the minor child into nonrelative foster care.  The Department of Family Services (DFS) recommended changing the permanency plan for the minor child from reunification to adoption.  Following an evidentiary hearing, the juvenile court changed the permanency plan from reunification to adoption.  Both Mother and AG (Father) appeal the juvenile court's change in the permanency plan.  After consolidating both appeals, and finding no error, we affirm.

## ISSUES

[¶2]   We frame the issues on appeal as follows:

1.   Did the juvenile court err in not requiring reunification efforts with grandmother before changing the permanency plan from reunification to adoption?

2.   Did the juvenile court err by changing the permanency plan from reunification to adoption?

3.   Did the juvenile court violate Father's due process rights by conducting the shelter care hearing and initial hearing in Father's absence?

## FACTS

[¶3]   Mother and Father, BG's biological parents, divorced in 2019.  *See generally Goswick v. Goswick*, 2020 WY 103, 469 P.3d 373 (Wyo. 2020).  The parties' divorce decree awarded Mother legal and physical custody of the minor child, with supervised graduated visitation for Father.  At the time of the divorce, Father was serving a term at the Wyoming State Penitentiary for aggravated burglary.  *See id.* ¶ 3, 469 P.3d at 374.

[¶4]   On February 5, 2021, the Sheridan, Wyoming, police initiated a traffic stop on a vehicle occupied by Mother and BG.  After a search of the vehicle yielded methamphetamine and syringes, the police arrested Mother for child endangerment and an

---

[1] The district court combined the shelter care hearing with the initial hearing.  Wyo. Stat. Ann. § 14-3-409(c) allows for "[a]n initial hearing may be held in conjunction with a shelter care hearing, provided the requirements of W.S. 14-3-413, 14-3-414 and 14-3-426 [are] met."  This combined hearing is referred to herein as the "shelter care hearing."

1

outstanding felony child endangerment warrant out of Park County. DFS took the minor child into protective custody.

[¶5] On February 8, 2021, the State filed a petition alleging neglect against Mother. Mother appeared at the following February 9, 2021 shelter care hearing, but Father was not served, did not return calls from DFS, and did not appear. On April 7, 2021, the juvenile court entered a stipulated order adjudicating the minor child neglected, ordered BG into DFS custody, and placed the minor child in nonrelative foster care. At the June 1, 2021 dispositional hearing, both parents were incarcerated and appeared from their respective detention centers. At the six-month review hearing, the case plan for the minor child remained reunification with Mother or Father despite both parents' continued incarceration.

[¶6] After Father's August 2021 release from the Johnson County jail, he began supervised video visits with BG around September 20, 2021. However, Father's supervised visits were suspended shortly thereafter by DFS when he was arrested in October 2021 for drug and probation violations. At the November 2021 review hearing, both parents participated from their respective confines, and the juvenile court ordered Father's visitation as approved by DFS and the guardian ad litem. In December 2021, Mother was transferred to the Wyoming Women's Center to serve an extended prison term for two separate child endangerment charges. By January 2022, with Father's parole status unlikely, DFS recommended the juvenile court change the permanency plan from reunification to adoption. On March 18 and 25, 2022, the juvenile court conducted an evidentiary hearing on the proposed change in the permanency plan. Both Mother and Father testified at the evidentiary hearing, and on May 9, 2022, the juvenile court issued its order changing the permanency plan from reunification to adoption and relieved DFS of further efforts to reunify.

[¶7] On appeal, Mother challenges the juvenile court's and DFS's lack of attention and consideration of extended family (the maternal grandmother) for placement and reunification efforts. Father argues DFS failed to make reasonable efforts to reunify him and the child. Finally, Father challenges the due process afforded him by the juvenile court during the shelter care hearing.

## STANDARD OF REVIEW

[¶8] Statutory construction is a question of law which this court reviews de novo. *In re DCP*, 2001 WY 77, ¶ 7, 30 P.3d 29, 30 (Wyo. 2001). The Court reviews the juvenile court's decision to change the permanency plan from reunification to adoption for an abuse of discretion. *In re RE*, 2011 WY 170, ¶ 10, 267 P.3d 1092, 1096 (Wyo. 2011). Due process claims are generally reviewed de novo. *See Verheydt v. Verheydt*, 2013 WY 25, ¶ 20, 295 P.3d 1245, 1250 (Wyo. 2013). However, because Father failed to address his due process rights to the juvenile court, our review of the issue is limited to a search for

plain error. W.R.A.P. 9.05; *In Int. of ECH*, 2018 WY 83, ¶ 21, 423 P.3d 295, 302 (Wyo. 2018); *KC v. State*, 2015 WY 73, ¶ 47, 351 P.3d 236, 248 (Wyo. 2015).

## *DISCUSSION*

### *I.     The juvenile court did not err by changing the permanency plan without requiring reunification efforts with the maternal grandmother.*

[¶9]    Mother asserts the juvenile court erred by changing the permanency plan from reunification to adoption without properly finding that DFS made reasonable efforts to reunify the child with extended family members. Mother argues the definition of "family" under Wyo. Stat. Ann. § 14-3-440(a) requires DFS to make reasonable efforts to reunify the minor child with more than just the minor child's parents. Specifically, Mother argues the juvenile court and DFS failed to properly consider placing BG with the minor child's maternal grandmother during the early case proceedings, thereby precluding a reasonable efforts finding as required by Wyo. Stat. Ann. § 14-3-440 of the Child Protection Act.

[¶10] Wyo. Stat. Ann. § 14-3-440(a) states that reasonable efforts shall be made to preserve and reunify the family:

> (i)     Prior to placement of the child outside the home, to prevent or eliminate the need for removing the child from the child's home; and
>
> (ii)    To make it possible for the child to safely return to the child's home.

Wyo. Stat. Ann. § 14-3-440(a) (LexisNexis 2021). "When interpreting a statute and its application, we first look at the plain language used by the legislature. If the statute is sufficiently clear and unambiguous, the Court simply applies the words according to their ordinary and obvious meaning." *In Int. of DT*, 2017 WY 36, ¶ 25, 391 P.3d 1136, 1144 (Wyo. 2017) (quoting *In re CRA*, 2016 WY 24, ¶ 16, 368 P.3d 294, 298 (Wyo. 2016)). A statute is clear and unambiguous if:

> [I]ts wording is such that reasonable persons are able to agree on its meaning with consistency and predictability. All statutes must be construed in *pari materia*; and in ascertaining the meaning of a given law, all statutes relating to the same subject or having the same general purpose must be considered and construed in harmony. If, however, the wording of a statute is ambiguous or capable of varying interpretations, we employ well-accepted rules of statutory construction.

3

*Spence v. Sloan*, 2022 WY 96, ¶¶ 34–35, 515 P.3d 572, 581–82 (Wyo. 2022) (quoting *Matter of Longwell*, 2022 WY 56, ¶ 21, 508 P.3d 727, 733 (Wyo. 2022)); *see also BJ v. KM*, 2021 WY 37, ¶ 9, 481 P.3d 1138, 1141 (Wyo. 2021).

[¶11]  Mother argues the term "family" in Wyo. Stat. Ann. § 14-3-440(a) necessarily requires DFS to make reasonable efforts to reunify the child with members of the child's extended family.   We do not interpret the Child Protection Act to require DFS's reunification obligations to extend that far.

[¶12]   The Child Protection Act (the Act) does not define "family." Wyo. Stat. Ann. §§ 14-3-401 through -441.  The Act does, however, delineate parties entitled to participation and notice in child protection cases.  For example, Wyo. Stat. Ann. § 14-3-415 requires the court to "insure the presence at any hearing of the **parents, guardian or custodian** of any child subject to the proceedings under this act."  Wyo. Stat. Ann. § 14-3-415(a) (emphasis added).  Furthermore, Wyo. Stat. Ann. § 14-3-422 requires the court to advise "the child's **parents, guardian or custodian**" of their right to be represented by counsel.  (Emphasis added.) Wyo. Stat. Ann. § 14-3-427 also provides that the multidisciplinary team "shall include" the "**child's parent, parents or guardian**," requires the multidisciplinary team to recommend goals "**the parents** should be required to meet for the child to be returned to the home," and to "review the progress of **the parents** and the child . . . ."  Wyo. Stat. Ann. §§ 14-3-427(c)(i), 14-3-427(f) (emphasis added); *see also* Wyo. Stat. Ann. § 14-3-406(b) (requiring notice to "the child's parent, guardian or custodian" when a child is taken into temporary protective custody); Wyo. Stat. Ann. § 14-3-414(c) (setting forth provisions for service on the child's "parents, guardian or custodian"); Wyo. Stat. Ann. § 14-3-419 (giving "parents, guardian, custodian or attorney" the ability to move for physical and mental examinations of the child).

[¶13]   The Act anticipates efforts be made toward preventing the "need for removal of the child from the child's home," reunification with the child's "family," and the child's "return to the child's home."  Wyo. Stat. Ann. § 14-3-429(a)(iv).  Wyo. Stat. Ann. § 14-3-440(a) also requires DFS to direct their efforts toward preventing removal "from the child's home" and returning the child to "the child's home."

[¶14]   When we examine these provisions together, we conclude that § 14-3-440(a)'s requirement for DFS to make "reasonable efforts . . . to preserve and reunify the family" requires reasonable efforts be made to return the child to his parents, guardian, or custodian in the home from which the child was removed.  The Alaska Supreme Court reached a similar conclusion in *Jena H. v. State*.  In this case, the court considered whether the Alaska Department of Family and Youth Services had a duty to make reasonable efforts to reunite a child with extended family:

> The language of AS 47.10.086(a) evinces that reunification efforts need not be directed at the extended

family: "[T]he department shall make timely, reasonable efforts to provide family support services to the child and to the *parents or guardian* of the child . . . ." In addition, "family support services" are defined as "services and activities . . . to prevent removal of a child from *the parental home*." Moreover, although the list of duties in subsections (1) and (2) may not be exhaustive, these subsections again refer only to "the parent or guardian" in laying out to whom DFYS owes the duty of reasonable reunification efforts.

.    .    .

[The statute] does not require reasonable efforts at reunification with extended family members . . . .

*Jena H. v. State*, No. S-10905, 2005 WL 1060549, at \*4 (Alaska May 4, 2005) (footnotes omitted). In that case, considering that grandmother was not the child's guardian or custodian, DFS had no obligation to make efforts to unite the child with her.

[¶15] The Court does not dispute that kinship *placement* may, in certain circumstances, be in a minor child's best interests. However, this is not absolute. In the present case, the record shows that grandmother lacked any kind of meaningful relationship with the minor child. At the time of the State's involvement, the maternal grandmother's most significant link to her grandchild was nothing more than biological. Her most recent contact with BG was in 2016. By the time of the permanency hearing, the grandmother was neither a "party" to the proceeding nor considered a viable placement option by DFS or the State of New York. Furthermore, although the record shows that the maternal grandmother was considered as a placement option, the permanency goal remained reunification with a "**parent**" throughout the entirety of the proceedings.

[¶16] The juvenile court heard testimony from grandmother at the permanency hearing. Although DFS explored placing the child with grandmother, further efforts ceased after grandmother was denied by the New York Interstate Compact on the Placement of Children (ICPC) process. Notwithstanding the parties' collective "frustration" with the ICPC process and its inconcinnity to the proceedings,[2] the evidence shows that grandmother had

---

[2] Wyoming has adopted and codified the Interstate Compact on Placement of Children. *See* Wyo. Stat. Ann. §§ 14-5-101 through -108. Both Wyoming and New York's iteration of the ICPC excludes "grandparents" from the provisions of the ICPC. Wyo. Stat. Ann. § 14-5-101, art. VII ("[t]his compact shall not apply to: (a) [t]he sending or bringing of a child into a receiving state by his parents, step-parent, grandparent, adult brother or sister, adult uncle or aunt, or his guardian or the leaving of the child with any such relative or nonagency guardian in the receiving state"); N.Y. Soc. Serv. Law § 374-a, art. VIII (McKinney 2023) ("[t]his compact shall not apply to: (a) [t]he sending or bringing of a child into a receiving

5

not visited the child since 2016, was not a party to the proceedings, the child was thriving in the current placement, and reunification with "family" remained the case objective.

[¶17] Wyo. Stat. Ann. § 14-3-440(a) does not require efforts to reunify a child with extended family. Considering that the grandmother was not the child's guardian or custodian and she was not involved in the child's upbringing, the juvenile court did not abuse its discretion when it did not require reunification efforts between the child and the maternal grandmother, and its reasons for excluding maternal grandmother as a placement option are supported by the record.[3]

## II. It was not an abuse of discretion for the juvenile court to change the permanency plan from reunification to adoption.

[¶18] Father argues that the juvenile court improperly determined that DFS made reasonable efforts to reunify BG with Mother or Father before changing the permanency plan from reunification to adoption. As this Court has recognized, "[t]o change a permanency plan, the juvenile court must determine whether the current plan is in the child's best interests and whether DFS has made reasonable efforts to finalize the plan." *Int. of SW*, 2021 WY 81, ¶ 17, 491 P.3d 264, 269 (Wyo. 2021) (citations omitted). Specifically, to change a permanency plan "from family reunification to adoption, a juvenile court must find that DFS made reasonable efforts to achieve reunification without success and that reunification is no longer in the children's best interest." *Int. of RR*, 2021

---

state by his parent, step-parent, grandparent, adult brother or sister, adult uncle or aunt, or his guardian and leaving the child with any such relative or non-agency guardian in the receiving state").

[3] Mother argues that the State was required to make reunification efforts with the maternal grandmother. However, placement and reunification are distinctly different. Wyo. Stat. Ann. § 14-3-208 states:

> (a)      When a child is taken into temporary protective custody pursuant to W.S. 14-3-405(a) . . . [t]he local department of family services office shall:
>
> .   .   .
>
> (iii)      Arrange for care and supervision of the child in the most appropriate and least restrictive setting necessary to meet the child's needs[.] . . . *When it is in the best interest of the child, the department shall place the child with the child's noncustodial birth parent or with the child's extended family*, including adult siblings, grandparents, great-grandparents, aunts or uncles.

Wyo. Stat. Ann. § 14-3-208(a)(iii) (emphasis added).
The juvenile court's order explains:

> It was testified to at the evidentiary hearing that the DFS has attempted to locate relative placement for the child. The ICPC study completed on [KL, NG's] mother, by the State of New York resulted in a denial of placement. In addition, [KL] testified at the hearing that she has not physically been in the child's life since he was approximately six (6) months old. She has not visited him in his home in Wyoming and he has not been in her home. Neither parent identified other viable placement options throughout the case until the day of the hearing.

6

WY 85, ¶ 97, 492 P.3d 246, 270 (Wyo. 2021) (citing *SW*, ¶ 17, 491 P.3d at 269). The State must prove that a change in the permanency plan is justified by a preponderance of the evidence. *Id.* ¶ 98, 492 P.3d at 270–71 (citations omitted). If the juvenile court determines that the State meets its burden, it may order a change in the permanency plan. *Id.* ¶ 97, 492 P.3d at 270 (citations omitted). We review the court's reasonable efforts determination for an abuse of discretion. *Id.* ¶ 98, 492 P.3d at 270–71 (quoting *In Int. of JW*, 2018 WY 22, ¶ 20, 411 P.3d 422, 426 (Wyo. 2018)); *Int. of MA*, 2022 WY 29, ¶ 25, 505 P.3d 179, 185 (Wyo. 2022). "A court does not abuse its discretion unless it acts in a manner which exceeds the bounds of reason under the circumstances." *Int. of AM*, 2021 WY 119, ¶ 9, 497 P.3d 914, 918 (Wyo. 2021) (quoting *Int. of AA*, 2021 WY 18, ¶ 33, 479 P.3d 1252, 1261 (Wyo. 2021)).

[¶19] As an abuse and neglect case, DFS is statutorily required to "make reasonable efforts to 'preserve and reunify the family[.]'" *SW*, ¶ 19, 491 P.3d at 270 (quoting Wyo. Stat. Ann. § 14-3-440(a)). Specifically, DFS must make reasonable efforts to "eliminate the need to remove the child[ren] from the home, or to make it possible for the child[ren] to safely return" to the home. *AM*, ¶ 15, 497 P.3d at 920 (citing Wyo. Stat. Ann. § 14-3-440(a)). "To be considered reasonable, the Department's efforts must 'have been accessible, available and appropriate.'" *MA*, ¶ 29, 505 P.3d at 186 (quoting *SW*, ¶ 20, 491 P.3d at 270 (quoting Wyo. Stat. Ann. § 14-3-440(e))).

[¶20] Although DFS was unaware of Father's whereabouts at the time of the February 9, 2021 shelter care hearing, the juvenile court and DFS believed that Father was incarcerated or on parole, and knew that his visitation, per the divorce decree, was supervised. By February 18, unsuccessful attempts to serve Father were made at his last known address and at the correctional institution where he was last incarcerated. In Father's absence, Mother informed the team that Father was "bouncing from pillow to pillow" at the first multidisciplinary team meeting on March 29, 2021. Nonetheless, Father was allowed (and required) to make telephone visits with the child as part of his case plan. Due to Father's frequently missed phone visits and the resulting impact on BG, DFS suspended Father's phone visits on May 19, 2021. According to DFS, as of May 24, 2021, of Father's twenty phone visit opportunities with the minor child, he engaged in a total of five.[4] The record shows that the majority of the missed phone visits with the child were due to Father, and that Father failed to arrange for in-person visits.

[¶21] In the permanency order, the juvenile court explained:

> Efforts were made by the DFS to determine the viability of placement with Father. Darin Fitzpatrick, the case worker at the time, drove to Casper, Wyoming to meet with Father but was unable to meet face-to-face or to ascertain whether he had

---

[4] According to Father, he made three of the visits, "out of maybe six or eight."

appropriate living arrangements and transportation. When Darin Fitzpatrick went to the location of Father's employment, he was advised that the employer was not aware of Father working there. Ms. Hillard testified that [AG] made references that he only had a few months to live and wanted to relinquish his parental rights.

The juvenile court further found:

> Dana Hillard, the second service case worker for the DFS who worked on the case, prepared a Case Plan in June 2021. Neither parent signed the Case Plan. The parents received the Case Plan from Ms. Hillard and were aware of its contents.
>
> .    .    .
>
> During the hearing held in March 2022, Dana Hillard and Kelly Shoop testified regarding the expectations set forth in the Case Plan for each of the parents, including but not limited to maintaining contact with the case worker on a weekly basis, abstaining from the use of alcohol and drugs, submitting to random testing, obtaining an ASI and psychological testing, attending visitation on a consistent basis, and following through with the recommendations of their evaluations—i.e., maintaining safe, stable housing and employment. The case workers testified that neither parent was compliant with the Case Plan or the Court's directives since the commencement of this action.

Finally, the juvenile court concluded:

> Father has continued to be incarcerated throughout most [sic] the case. When the case was initiated on February 6, 2021, [AG] had just been released from prison for having committed the crime of Burglary. He is currently at the Wyoming Medium Correctional Facility in Torrington, Wyoming due to a revocation of his parole. He has been incarcerated in Johnson County and Natrona County for different probation sanctions. Father testified that in between incarcerations, he did not maintain contact with the social service case worker, did not follow through with visitations, did not have safe, secure housing or steady employment and did not work on the DFS Case Plan. He also testified that he

relapsed and continued to use methamphetamine. Father's visitation was eventually suspended by the DFS due to Father's failure to follow the requirements of COMPASS and the supervising agency, as well as, the emotional impact and disappointment his missed visits had on the minor child.

[¶22] According to the June 2021 multidisciplinary team report, Father did not attend the multidisciplinary team meeting because he was incarcerated. Father once again failed to attend the October 6, 2021 multidisciplinary team meeting. Although Father's attorney attended the October 6, 2021 meeting, the report indicates that Father's attorney had no contact with him and had nothing to report on his behalf. Further, the multidisciplinary team report shows that a DFS agent met with Father at the Buffalo jail on July 28, 2021, to discuss Father's case expectations. Although Father agrees that he attended this July 28 meeting, he testified that he did not discuss any specifics about his case plan.

[¶23] We have explained that "in the absence of parental cooperation . . . continuing efforts to rehabilitate the parent become not only unreasonable, but contrary to a child's best interest at some point." *JW*, ¶ 21, 411 P.3d at 426. "[A]n agency is not required to provide services indefinitely when a parent is either unable or unwilling to apply the instruction received." *In re R.T.*, ¶ 21, 778 A.2d 670, 681 (Pa. Super. Ct. 2001). The record supports a finding that despite receiving repeated instruction on his case plan, Father continually disregarded or failed to follow the plan's reasonable requirements, including securing a substance abuse evaluation, securing employment and stable living arrangements, remaining drug free, or making regular phone calls or in-person visits with his child.

[¶24] The record also shows that DFS successfully located Father and involved him in the case as early as April 2021. According to Dana Hillard, the second DFS agent on this case, Father began visits with BG at "either the end of April or beginning of May of 2021, but they were soon suspended due to lack of follow through and participation on the father's part." Visitation was set up again in September after Father completed an IOP program. However, according to Ms. Hillard, visitation "did not go well at all." Specifically, Father failed to attend four of the five visits DFS set up. Between April and December, the record shows that Father did not participate in any of the in-person visits offered by DFS. Furthermore, Father refused to sign the case plan presented by DFS despite awareness of its contents and requirements. At the permanency hearing, Father acknowledged that he was not maintaining contact with DFS, did not have stable housing or employment, relapsed on methamphetamine, and was serving time (again) in prison.

[¶25] A child's health and safety are the paramount concern when determining the efforts required by DFS. *Int. of VS*, 2018 WY 119, ¶ 43, 429 P.3d 14, 26 (Wyo. 2018); Wyo. Stat. Ann. § 14-3-440(b). "To that end, 'timely placement of children in accordance with a permanency plan may take precedence over family reunification, and reunification efforts

9

inconsistent with the permanency plan may be discontinued.'" *VS*, ¶ 43, 429 P.3d at 26 (quoting *In re NDP*, 2009 WY 73, ¶ 21, 208 P.3d 614, 619 (Wyo. 2009)); *SW*, ¶ 19, 491 P.3d at 270.

[¶26] When considering the reasonableness of DFS's efforts, this Court previously observed that, "there is a limit to what courts can require[.]" *JW*, ¶ 21, 411 P.3d at 426. Further, "[a] parent's failure to take advantage of available services, or to meaningfully participate in a case plan developed by DFS with [a parent's] input, is persuasive evidence that reasonable rehabilitative efforts have been unsuccessful." *JW*, ¶ 21, 411 P.3d at 426 (footnote omitted) (citing *SD v. Carbon Cnty. Dep't of Fam. Servs.*, 2002 WY 168, ¶ 23, 57 P.3d 1235, 1241 (Wyo. 2002)); *SW*, ¶ 20, 491 P.3d at 270. The record demonstrates that although Mother and Father were incarcerated throughout the proceedings, both parents received phone visits and opportunities to stay involved with the minor child. Despite DFS's efforts to encourage and allow Father's relationship with the minor child to grow, Father chose to avoid contact with DFS and failed to make even modest strides with the case plan, including the most basic task of staying in touch with the minor child. The record shows that Father's continuous failure to stay in contact with BG was proving to be detrimental for the child's well-being.

[¶27] We have explained that "[w]hen the rights of a parent and the rights of a child are on a collision course, the rights of the parent must yield." *SD*, ¶ 27, 57 P.3d at 1241 (quoting *Matter of MLM*, 682 P.2d 982, 990 (Wyo. 1984)). "While parents have a fundamental right to raise their children, children have a right to stability and permanency in their family relationships." *Matter of JPL*, 2021 WY 94, ¶ 62, 493 P.3d 174, 186 (Wyo. 2021) (quoting *In re A.D.*, 2007 WY 23, ¶ 31, 151 P.3d 1102, 1109–10 (Wyo. 2007)); *Matter of ALRW*, 2023 WY 20, ¶ 36, 525 P.3d 627, 634 (Wyo. 2023).

[¶28] It is imperative that DFS engage in reasonable efforts to reunify children with their parents, even when the parents are incarcerated. What constitutes reasonable efforts varies from case to case. "Wyo. Stat. Ann. § 14-3-440(e)'s 'accessible, available and appropriate' language and *In re HP*'s discussion of 'tailored' case plans suggest that [DFS] is obligated to make reasonable efforts suitable to the unique situation of the family involved." *Matter of BAD*, 2019 WY 83, ¶ 37, 446 P.3d 222, 232 (Wyo. 2019) (Fox, J., specially concurring); *SW*, ¶ 20, 491 P.3d at 270. Here, DFS's efforts were tailored to the parents' situation and served as a reasonable starting point for Father to develop a relationship with the minor child. Nonetheless, when not incarcerated, Father was offered and refused phone and in-person visits and further failed to maintain his sobriety. When incarcerated, Father continued to ignore the case plan objectives, failed to remain in contact with DFS and the child, and often failed to attend the multidisciplinary team meetings. Under the circumstances and facts presented, the Court finds that the juvenile court did not abuse its discretion by changing the permanency plan from reunification to adoption.

***III.***    ***The juvenile court did not commit plain error by conducting the shelter care and initial hearing in Father's absence.***

[¶29] Father claims the juvenile court violated his right to due process by failing to provide him proper notice and the opportunity to be heard during the early stages of the proceedings. The question whether the juvenile court afforded an individual due process is one of law subject to de novo review. *DT*, ¶ 23, 391 P.3d at 1143; *Verheydt*, ¶ 20, 295 P.3d at 1250. However, "[w]e have often repeated that we will not consider a new issue on appeal that has not first been brought to the attention of the district court." *DT*, ¶ 23, 391 P.3d at 1143 (quoting *In re AGS*, 2014 WY 143, ¶ 33, 337 P.3d 470, 480 (Wyo. 2014)). Accordingly, because Father failed to address this issue to the juvenile court, our review is limited to a search for plain error. W.R.A.P. 9.05; *ECH*, ¶ 21, 423 P.3d at 302; *KC*, ¶ 47, 351 P.3d at 248. "Plain error occurs when '1) the record is clear about the incident alleged as error; 2) there was a transgression of a clear and unequivocal rule of law; and 3) the party claiming the error was denied a substantial right resulting in material prejudice.'" *DT*, ¶ 23, 391 P.3d at 1143 (quoting *AGS*, ¶ 34, 337 P.3d at 480). Furthermore, the appellant bears the burden of proving plain error.

[¶30] In the present case, the record clearly reflects the course of proceeding. Specifically, the record demonstrates the State's failure to notify Father about the shelter care hearing, thereby satisfying the first part of the plain error test. To satisfy the second part of the test, Father must show a violation of a clear and unequivocal rule of law. Father asserts that his due process rights were violated. The Fifth and Fourteenth Amendments to the United States Constitution prohibit the government from depriving any person of "life, liberty, or property, without due process of law." *See also* Wyo. Const. art. 1, § 6 ("No person shall be deprived of life, liberty or property without due process of law."). Furthermore, procedural due process requires the government to provide a parent with reasonable notice and a meaningful opportunity to be heard before interfering with the fundamental right to familial association. *In re DSB*, 2008 WY 15, ¶¶ 26–27, 176 P.3d 633, 639 (Wyo. 2008); *In re "H" Children*, 2003 WY 155, ¶ 38, 79 P.3d 997, 1008 (Wyo. 2003). The required procedural process required to satisfy a parent's right to due process varies depending upon "the nature of the proceeding and the interests involved." *KC*, ¶ 32, 351 P.3d at 245.

[¶31] The Act establishes procedures for protecting the fundamental right of familial association while guarding the health and safety of children. Wyo. Stat. Ann. §§ 14-3-401 through -441. Our focus in this matter centers on the statutory procedures required in the early stages of a child protection case. *AA*, ¶¶ 15–16, 479 P.3d at 1257.

[¶32] The record shows that the State was unable to notify Father about the shelter care hearing conducted February 9, 2021. Although the reason for this failure remains unclear, the record is clear that Father began participating in the case by at least the first dispositional hearing on June 1, 2021, where DFS identified reunification as the plan for the minor child. *Supra* ¶ 5. Father has not established that his due process rights were

violated when he did not receive notice of the shelter care hearing. Regardless of Father's reasons for not attending the shelter care hearing, the Act requires DFS to notify a child's parents as soon as possible when a child is taken into protective custody. Wyo. Stat. Ann. § 14-3-406(b). Under § 14-3-406(a) and (b), a person taking a child into protective custody must release the child to his parent unless shelter care is necessary to protect the child's person or provide a child "having no parent . . . with supervision and care[.]" Wyo. Stat. Ann. § 14-3-406(a)–(b).

[¶33] Section 14-3-208(a)(iii) states:

> (a) When a child is taken into temporary protective custody pursuant to W.S. 14-3-405(a) . . . [t]he local department of family services office shall:
>
> .   .   .
>
> (iii) Arrange for care and supervision of the child in the most appropriate and least restrictive setting necessary to meet the child's needs . . . . *When it is in the best interest of the child, the department shall place the child with the child's noncustodial birth parent or with the child's extended family*, including adult siblings, grandparents, great-grandparents, aunts or uncles.

Wyo. Stat. Ann. § 14-3-208(a)(iii) (LexisNexis 2021) (emphasis added).

[¶34] Wyo. Stat. Ann. § 14-3-414(e) provides in pertinent part:

> However, notwithstanding any provision within this act, the court may order that a child be taken into custody as provided in W.S. 14-3-413 or that a child be held in shelter care pending further proceedings as provided in W.S. 14-3-409, even though service of order to appear on the parents, guardian or custodian of the child is not complete at the time of making the order.

Wyo. Stat. Ann. § 14-3-414(e).

[¶35] Generally, due process requires notice and an opportunity to be heard. *Matter of TJH*, 2021 WY 56, ¶ 10, 485 P.3d 408, 412 (Wyo. 2021). "The required process varies depending upon 'the nature of the proceeding and the interest involved.'" *VS*, ¶ 28, 429 P.3d at 22 (citation omitted). The Act allows for temporary protective custody of a child in a parent's absence to meet a child's needs. Wyo. Stat. Ann. § 14-3-414(e). Here, Mother

was incarcerated, and Father's location was unknown. Under these circumstances, considering the focus on a child's safety at the initial stage of child protection proceedings, taking temporary protective custody of the minor child was appropriate and did not interfere with Father's fundamental right to familial association. *DSB*, ¶¶ 26–27, 176 P.3d at 639; *"H" Children*, ¶ 38, 79 P.3d at 1008; *see, e.g.*, Wyo. Stat. Ann. § 14-3-405(a)(i) (providing that "[a] child . . . may be taken into custody by a law enforcement officer without a warrant or court order and without the consent of the parents . . . when: (i) [t]here are reasonable grounds to believe a child is abandoned, lost, suffering from illness or injury or seriously endangered by the child's surroundings and immediate custody appears to be necessary for his protection").

[¶36]  Considering Wyo. Stat. Ann. § 14-3-409(a)'s requirement to conduct the shelter care hearing within forty-eight hours, Mother's incarceration, and Father's unknown whereabouts, the Court finds good reason existed for the juvenile court to conduct the shelter care hearing in Father's absence. Unlike the situation in *Interest of AA* where this Court reversed the juvenile court's order allowing the cessation of reasonable efforts to reunify for failure to notify Father, the juvenile court had statutory authority and good reason to order temporary protective custody. Furthermore, Father was notified and involved in subsequent proceedings. Under these circumstances, the Court finds that Father fails to demonstrate that the juvenile court violated a clear and unequivocal rule of law. Without a showing that the juvenile court violated a clear rule of law, the Court finds no plain error.

## CONCLUSION

[¶37]  The juvenile court did not err when it excluded the maternal grandmother as a placement option for the minor child. Furthermore, the juvenile court did not err when it changed the permanency plan from reunification to adoption and allowed DFS to cease further reunification efforts. Finally, Father was not materially prejudiced by his absence from the shelter care hearing and the juvenile court did not commit plain error. We affirm.